## Thomas v. Marshall.

(Decided October 8, 1914.)

### Appeal from Green Circuit Court.

1. Elections—Contested—Recount of Ballots—When Ballots Will Prevail Over Certificate of Election Officers.—Where the ballots are preserved so that their identity is assured, they can be counted during a contest and are undoubtedly better evidence of the vote cast than the returns of the election officers, and should prevail where there is a difference. The ballots cast in an election are the best evidence, but this is conditioned strictly upon the fact that their integrity is clearly established: otherwise the certificate of the officers of the election should prevail.

2. Elections—Contested—Character of Election Officers and Manner of Discharging Duty.—When sober, intelligent, honest election officers have performed their duty carefully, it requires stronger evidence to overcome their returns than it would if they had exercised less care or had been men of less integrity and character.

3. Elections—Boxes and Ballots—Duty of Clerk to Safely Keep in His Office—When He May Remove Them to a Safe Place.—It is the duty of the county clerk, although he may have been a can-

didate for re-election and be in the attitude of contesting the right of his adversary to the certificate, to retain the custody of the boxes and ballots. But when there is a contest about the office of clerk, it is permissible that the boxes and ballots, by consent of the parties interested, should be placed in the custody of a bank or put in any other place where they may be safely kept pending the contest; but when so removed the clerk, who is the custodian of the ballots, should exercise the greatest care in selecting a safe depository.

4. Elections—Contested.—Evidence examined and held to show that the ballots had been tampered with and therefore should not be allowed to overthrow the certificate of the election officers.

J. H. GRAHAM, WM. MARSHALL BULLITT and W. F. MILBY for appellant.

JEFF HENRY and C. H. NOGGLE for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellant Thomas and the appellee Marshall were contending candidates for the office of County Clerk of Green County at the November election, 1913, Thomas being the Republican candidate and Marshall the Democratic candidate.

The return of the election as certified to by the election officers showed that all of the Republican candidates for county offices had been elected and that Thomas had received a majority of thirty-one votes over Marshall. Accordingly all the Republican candidates, including Thomas, were given certificates of election by the election commissioners.

Within the time prescribed by law Marshall filed his petition in the Green Circuit Court asking for a recount of the vote in North Greensburg precinct upon the ground that the officers of election in that precinct had made a mistake in certifying the vote received by him and the vote received by Thomas in that precinct. He averred that the returns of the officers of election showed that Thomas had received 152 votes and Marshall 139 votes, when in fact he had received in that precinct 159 votes and Thomas 132 votes, as the ballots, if recounted, would show.

After the issues had been made up, depositions were taken by both parties, and on a trial of the case before the circuit court, oral evidence introduced by both parties and preserved in the form of a bill of exceptions, was heard by the court, and upon the conclusion of the evi-

dence, the court, over the objection of counsel for Thomas, recounted the ballots. According to this recount, Marshall had received in this precinct 159 votes, the number of votes he averred in his petition had been cast for him, and Thomas had received 132 votes. This recount changed the Republican majority of 13 in this precinct into a Democratic majority of 27, and resulted in the election of Marshall by a majority of 9 votes.

From the judgment of the circuit court holding that Marshall had been elected and was entitled to the certificate of election, Thomas prosecutes this appeal.

The only question in the case is, should the court have recounted the ballots? The solution of this question depends on how the ballots and box in this precinct were preserved between the time of their return to the county clerk by the election officers and the time when the box was opened and the ballots recounted by the court.

There is no difficulty about the law applicable to this case. The rule announced in Edwards v. Logan, 114 Ky., 312, which was adopted with elaboration from Bailey v. Hurst, 113 Ky., 699, had been adhered to in a number of cases. In that case it was thus stated:

"The rule may be stated to be that, where the ballots are preserved so that their identity is assured, they can be counted during a contest; and they are undoubtedly better evidence of the vote cast than the returns, and should prevail where there is a difference. But before a recount of the ballots should be allowed to rebut the presumption of the correctness of the official returns, it should be proved satisfactorily that the ballots had not been tampered with since the election, and that those offered in evidence are the identical ones cast. * * * Every consideration of public policy, as well as the ordinary rules of evidence, require that the party offering this evidence should establish the fact that the ballots are genuine. It is not sufficient that the mere probability of security is proved, but the fact must be shown with a reasonable degree of certainty. If the boxes have been rigorously preserved, the ballots are the best and highest evidence, but, if not, they are not only the weakest, but the most dangerous evidence."

After citing a number of authorities, the court further said: "From these authorities this court holds: That the ballots cast in an election are the primary and best evidence of the voters' will as expressed therein, and that in case of a contest, as between the certificates of

the officers of election and the ballots, the ballots are the best evidence, but that this is conditioned strictly upon the fact that the integrity of the ballots is clearly established; otherwise the certificate of the officers of election should prevail. That when the ballots are produced from the custody of the officer, whose duty it is to preserve them, are shown to have been preserved from intermeddling from unauthorized persons, and are apparently unchanged, they will be received as evidence of what they may show upon their face; but where they may have apparently been tampered with, or where opportunities have been afforded to unauthorized persons, or to persons interested to tamper with them, then the burden is upon the party producing and relying upon such ballots to establish their integrity clearly and satisfactorily by the evidence.'' Hamilton v. Young, 26 Ky. L. R., 447; Galloway v. Bradburn, 119 Ky., 49; Scholl v. Bell, 125 Ky., 750; Browning v. Lovett, 139 Ky., 480; Baker v. Dinsmore, 138 Ky., 277; Powell v. Horn, 159 Ky., 532; Snowden v. Flanery, 159 Ky., 568; McEuen v. Carey, 123 Ky., 536.

The law being thus so well settled, it only remains to determine whether the difference between the number of votes certified by the election officers to have been cast for Marshall and Thomas and the number of votes found on a recount of the ballots by the court to have been cast for them, was the result of a mistake on the part of the election officers or the result of the ballots being tampered with between the time of their delivery to the county clerk by the election officers and the time when they were recounted by the court.

It might be here observed as worthy of notice that the recount by the court of the ballots in all the races in this precinct showed that in the other contested races for county officers, and there were several of them, the election officers had not made any material mistake in certifying correctly the number of votes cast for each candidate as shown by the ballots. But in this particular race the recount showed, as we have stated, that Marshall had received 159 votes when the election officers only gave him 139, and that Thomas had received only 132 votes when the returns of the election officers showed that he had received 152 votes. Or, in other words, the recount showed that the election officers returned that Marshall had received 20 votes less than the recount

showed and that Thomas had received 20 votes more than the recount showed. This discrepancy in the return of the election officers and the recount, confined as it is to one race, is so great as to create at once the suspicion that the error if made in the return of the election officers in this race, was the result of design rather than mistake, or that the ballots were tampered with between the election and the recount.

Of course, election officers often make mistakes. All honest men are liable to make mistakes, and it would not at all follow that the election officers were dishonest because a recount of the ballots showed that they had made a mistake in certifying the vote. But this presumption of honesty cannot well be indulged in when the mistake is confined to a single race and is so large as the one here appearing.

It therefore becomes important to inquire what character of men these election officers, including challengers and inspectors, were; how they discharged their duties and what influences, if any, were operating to produce a mistake like this. The record shows, as we will presently point out more in detail, that they were sober, intelligent, honest, careful men, and that they discharged with unusual fidelity all of their duties. They were equally divided between the Republicans and Democrats, and there is no intimation in the evidence or suggestion in briefs of counsel that any of these officers intentionally made a mistake or that any of them desired to do otherwise than perform his duties faithfully and make correct returns of the number of votes cast for each candidate.

As illustrating the care exercised by the election officers in counting the ballots and certifying the results, we may refer to the deposition of Clem Scott, Clerk of the election and a Democrat, who said he assisted in counting the votes cast at the election. That he signed the certificate in the back of the stub book and that it was correct to the best of his knowledge. That in counting the ballots they separated the straight Republican ballots and the straight Democratic ballots and the mixed ballots. That in thus separating the ballots one mixed ballot got in with the straight ballots and created some confusion for a time. That on account of a mistake made by the sheriff of the election in calling off the mixed ballots, they had to count the ballots over; so that the ballots were counted twice. That J. H. Hall held the Repub-

lican ballots while they were being counted, V. D. Coakley the Democratic ballots, and Gorin the mixed ballots, and that he kept the tally sheet for the Democrats, and that he thought the count was correct.

V. D. Coakley, the Democratic judge, said that much care was used in counting the ballots and that no mistake was made, so far as he knew. That when the vote had been counted, all the officers agreed that it had been correctly counted and signed the certificate. That he did not think it possible that a mistake should have been made. That when an election officer of one political faith was calling off or counting ballots, another election officer of the other political faith was observing to see that no mistake was made. That the straight Democratic ballots were put in one pile and the straight Republican ballots in another pile and the mixed or cross ballots in another pile.

Woodson Lewis, a Republican inspector, in relating the manner in which the ballots were counted, said: "Gupton took the ballots from the box; he passed the ballots to one of the election officers; this officer scanned them closely. The straight Democratic ballots, the best of my recollection, were passed to V. D. Coakley, the straight Republican ballots were passed, I think, to T. J. Gorin, the mixed, crossed and irregular ballots to Mr. Scott. When the ballots were all separated and scanned closely by the election officers, I asked for a tally sheet to take the count on. I kept the tally. Mr. Gorin would occasionally make a mistake. The mistakes were made both ways, against Democratic candidates and against Republican candidates. I looked at the ballots in each instance and knew they were all right after the ballots were all tallied and the votes counted for each candidate. Then they were scanned closely again, and somebody found one ballot that was crossed for Mr. Marshall, the Democratic candidate for clerk. This was found with the straight Republican ballots, and this correction was made from Mr. Thomas to Mr. Marshall. Then we counted all the ballots and examined all the stubs and found there was one ballot short. Somebody remarked we would have to find it if it took all night. Mr. Scott found it and the certificate was made out." He said he did not think it was possible that any mistake could have been made.

It further appears from the evidence of these officers that when the ballots were strung, after being counted,

the straight Republican ballots were put first, the straight Democratic ballots next and the mixed ballots next, that the envelope was sealed, and in fact every detail required by the election law was strictly followed.

In addition to this we have in the record a tally sheet made up by one of the election officers, the verity of which does not seem to be questioned, and this tally sheet shows that Thomas received 132 straight Republican votes and 20 crossed Democratic votes, making 152, and that Marshall received 112 straight Democratic votes and 27 crossed Republican votes, making 139 votes. There are also three election certificates, each of them signed by the four election officers. These certificates give the number of votes received by each candidate at the election, and they show that Marshall received 139 votes and Thomas 152. The certificate on the stub book, signed by the election officers, also shows that Marshall received 139 votes and Thomas 152 votes. The vote of Thomas on this certificate as originally made out appears to have been partially erased, but we do not regard this as material or significant.

It appears from these several records, made on the day of the election, before the officers had separated, that there was no difference of opinion between the election officers as to the number of votes received by these candidates.

In view of the care thus shown to have been exercised by these election officers, it is highly improbable that they made the mistake shown by the recount of the ballots. Of course it is possible that they made the mistake attributed to them by counsel for Marshall of overlooking 20 votes cast for Marshall, but we repeat it is not probable that they did; and their evidence put upon the contestant attacking their return the burden of showing by convincing evidence that the ballots had not been tampered with after they left the hands of the election officers.

When election officers have performed their duties, as the evidence shows these election officers did, it requires stronger evidence to overcome their returns than it would if they had exercised less care or had been men of less integrity. But, notwithstanding the care exercised by honest, sober and intelligent election officers, and the legal presumption that they have faithfully performed their duty, the ballots are the best evidence when

it is clearly shown that neither the box nor the ballots have been tampered with.

As said in McEuen v. Carey, 123 Ky., 536: "The rule in this State is firmly established that in an election contest the certificate of the precinct officers is prima facie evidence of the correctness of their count; but if the ballots themselves have been lawfully kept, and are shown not to have been tampered with, then they must prevail over the certificate."

It is, however, very pertinent in cases like this to look into the character of the election officers and the manner in which they discharged their duties, as an aid in determining whether the error discovered on a recount was made by them or was the result of the ballots being tampered with after the election. As illustrating the admissibility of evidence of this character, attention may be again called to the McEuen case, in which the court said:

"We do not believe the officers were drunk, although there is evidence in the record tending to show that the clerk was intoxicated, and that others were under the influence of liquor. But it is admitted to be true that there was a quart bottle of wine in the room where the election was held, and it was, to some extent, imbibed by the officers. Assuming as we do, that they did not intoxicate themselves, yet this fact shows that they were guilty of a violation of the law; and, being wilful violators of their sworn duty in this regard, the weight which we would otherwise feel was due the result of their official labors is materially lessened."

In view, then, of the character of these election officers and the manner in which they discharged their duty, together with the presumption that it was correctly performed, it becomes especially incumbent that the care of the boxes and ballots after the election and the appearance of the contents of the box and ballots on a recount should be carefully scrutinized for the purpose of ascertaining if the box and ballots were exactly in the same condition as when they left the hands of the election officers. To this feature of the case we will now address ourselves.

The box in this precinct was delivered to the county clerk by the election officers on the morning after the election, and, according to all the evidence, the box and the ballots were then in precisely the same condition as

they were when the box was locked at the close of the election. Marshall was county clerk at the time the election was held and was a candidate for re-election. When this and the other boxes were delivered to him, they were placed in the clerk's office on the floor, accessible to any person who might, with good or evil designs, desire to look at or examine them.

It is further shown that there were several keys in the hands of different persons in Greensburg, the county seat, that would unlock the door of the county clerk's office, and that the windows of this office were only a few feet from the ground and were seldom locked or fastened at night. There was also evidence tending to show that there were in the office keys of old locks for election boxes that might or would open the locks on this North Greensburg box, and also evidence that on one or two nights a light was seen in the clerk's office at a time when the window shutters were closed and the window shades down. Whether these lights were seen in the office before or after the boxes were removed from the clerk's office to the Greensburg Bank, is in sharp dispute, the evidence on the one side being to the effect that the lights were seen in the office before the boxes were removed, while the evidence for the other side is to the effect that the lights were in the office after the removal of the boxes.

As to the removal of the boxes, which took place, according to the evidence of Marshall on the 11th of November, and according to the evidence of Thomas on the 13th of November, it is, in substance, this: After the boxes had been in the clerk's office from the time of their return by the election officers until either the 11th or 13th of November, as the case may be, on one of these days Marshall, who it seems was considering the question of contesting the election, or at any rate, it was anticipated that he would, was called up at his home some three miles from Greensburg late in the afternoon and requested, in view of his contemplated contest, to place the ballot boxes in the custody of the Greensburg Bank. This request was made by Republicans representing Thomas; and in compliance with it the boxes, either on the 11th or 13th of November, were removed to the Greensburg Bank and placed in the vault, where they remained until the recount by the court. And we might here add that there is no suggestion from any

source that either the boxes or ballots were disturbed after being placed in the bank.

The question, however, is raised as to the legality of the action of Marshall in consenting that the boxes might be removed from the clerk's office, the place designated by law for their safe-keeping. A like question was before us in McEuen v. Carey, *supra*. In that case Carey, the county clerk, was a candidate for re-election. His opponent, McEuen, was given the certificate of election by the Commissioners, whereupon the election was contested by Carey, who, upon a recount of the ballots by the court, was found to have a majority. The election boxes were, under the law, returned by the election officers to the county clerk, and in that case were kept in his custody until the recount. In discussing the duty of the county clerk, even when he is contesting the election, to retain the custody of the ballots, the court said:

"The law makes it the duty of the county clerk to receive and keep the returns of the precinct officers until they have served their ultimate purpose. He cannot escape his duty if he would, and he has no right to shift the responsibility to another. Even when a party in interest, as here, it is none the less his duty to keep and preserve the official returns. He is not only a trustee in his own election, but also in that of the other candidates for the various offices involved, and in a higher sense he is the trustee for the people, whose interest overshadows that of the candidates. And while, so far as his own interests are concerned, a sensitively scrupulous officer might desire, as between himself and his opponent, to place the ballots in the custody of some disinterested party, yet we know of no principle which would authorize him thus to shift the duty which the law imposes upon him. This being true, it must follow that, legally, no adverse presumption, based upon self-interest, can be drawn against the county clerk engaged in a contest for his office because of his custody of the ballots."

Adopting the views expressed in this opinion, it is not only the right, but the duty of the county clerk, although he may have been a candidate for re-election and in the attitude of contesting by legal proceedings the right of his adversary to the certificate, to retain the custody of the boxes and ballots. But, notwithstanding this, we think that when the clerk, whose duty it is to receive

and retain the custody of the boxes and ballots, is contesting the election of his adversary, to whom the certificate has been given, or when his right to the certificate is being contested by his opponent, it is permissible that the boxes and ballots, by consent of the parties interested, should be placed in the custody of a bank or put in any other place where they may be safely kept pending the contest.

A course of this kind will relieve the clerk of the embarrassment of having the control of boxes and ballots upon the result of which his right to the office may depend, and when he is requested by his adversary to remove the boxes to a place where they may be safely kept, and consents to the removal, his action is to be commended rather than criticized, and under circumstances like this, the removal, when made by consent, to a place of unquestioned safety, cannot well be said to be a violation of law. The ballots, although removed from the clerk's office, are, legally speaking, yet in the custody of the clerk and subject to his control. They have simply been removed from the clerk's office to another place at which they may be preserved more safely than in the clerk's office. The clerk, however, being responsible for the safe-keeping of the boxes and ballots, and the clerk's office being the place set apart by law for their keeping, the greatest care should be exercised by him in selecting a safe depository, if one is selected.

Passing this and the outlined evidence showing the facilities for tampering with the boxes and ballots while they were in the clerk's office, before their removal to the bank, we will now look for a moment into the condition of the envelope enclosing the ballots in the box and the appearance of the ballots when the box was opened and the ballots recounted by the court.

The election officers, as required by law, placed the counted ballots in a large envelope, and after sealing the flap with the mucilage attached, and writing their names on the outside of the envelope, they put sealing wax in three places on the edge of the flap and stamped this sealing wax with a circular seal, having on it the words "North Greensburg, Green Co. Election."

When this envelope was taken from the box, the judge certified in the bill of exceptions that "the seal on each side of the bag containing the counted ballots was found partially fast, with the lap of the bag from each

of these seals out to the end not glued down, the center seal being well fastened and apparently undisturbed. But the word 'North' did not show in either of the side seals, that part of said side seals being broken off and gone; and on the center seal it showed only partially, it being disfigured to such an extent that it cannot now be determined whether the word is 'North' or 'South' on said seal."

There was in the clerk's office during the time the ballots were there a seal having on it the words "South Greensburg, Green Co. Election," and it would appear that when the envelope was wrongfully opened and new wax put on, this wax was stamped with the South Greensburg and not the North Greensburg seal. Then that part of the wax that should have on it the word "North" was broken off, so that it could not be told whether the impression was made with a North or a South Greensburg seal.

At any rate, the envelope was not in the condition it was when placed in the box by the election officers. The condition of the seals, which were broken, and the envelope, which was not well glued, leave the impression that the envelope had been tampered with.

There is also evidence that the string was tied around the ballots by the election officers in a hard knot, but when opened by the court it appeared to be tied in a bow knot. It is further shown that on the recount many of the mixed ballots were found with the straight ballots, although the election officers testified that the mixed ballots and the straight Republican and the straight Democratic ballots were placed separately on the string. There are other circumstances that we might notice indicating that these ballots had been tampered with, but the facts we have mentioned are, we think, sufficient to discredit them to such an extent that they ought not to be received as evidence to set aside the returns of the election officers. After the box and envelope had been opened and access had to the ballots, it was an easy matter to take a stencil and stamp opposite Marshall's name a sufficient number of Republican ballots to make the change indicated, and this we think was done.

The circumstances discrediting the ballots in this case as evidence to overthrow the returns of the election officers, are quite similar to those appearing in Hamilton v. Young, 26 Ky. L. R., 447, in which it was

held that the return of the officers would prevail over the ballots.

Unfortunately, the evidence does not disclose who tampered with these ballots, although we are satisfied that some one did. It is not charged, and if it were, there would be no evidence to sustain it, that Marshall had any connection with this fraud, but of course his freedom from complicity in it does not affect the question, as the law will not permit him to be the beneficiary of a fraud like this no matter by whom it was committed.

Wherefore, the judgment is reversed with directions to enter a judgment dismissing the petition.